# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------

|  |  |  |
|---|---|---|
| JBAAM SPECIAL OPPORTUNITIES FUND II LLC, and YA II PN, LTD., | : : | Index No. |
| Plaintiffs, | : : : | **Summons** |
| -against- | : : | **Plaintiff designates New York County as the place of trial** |
| REZOLVE AI PLC and DAN WAGNER, | : : : | **Venue is in this County pursuant to CPLR § 503 and the parties' agreement** |
| Defendants. | : | |

--------------------------------------------------------------

To the Above Named Defendants:

**PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED** and required to serve upon Plaintiffs' attorneys, at the address stated below, a notice of appearance and answer to the complaint, within twenty (20) days after the service of this Summons, exclusive of the day of service, or within thirty (30) days after service if this Summons is not personally delivered to you within the State of New York. This Court has personal jurisdiction over this proceeding pursuant to CPLR § 301 and 302. Venue is proper in this Court pursuant to CPLR § 503 and the parties' agreement. Plaintiffs designate New York County as the place of trial. The nature of this action and the relief sought is set forth in the Complaint below.

**YOU ARE HEREBY NOTIFIED** that on your failure to appear or answer, a judgment will be entered against you by default in an amount to be determined plus interest at the rate prescribed by law and the costs of this action, and granting the relief requested in the Complaint below.

Dated: July 18, 2025

/s/ *Eric Brenner*
Eric Brenner
Marc Ayala
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
(212) 446-2300
ebrenner@bsfllp.com
mayala@bsfllp.com

*Counsel for Plaintiffs JBAAM Special Opportunities Fund II LLC and YA II PN, LTD.*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------------

JBAAM SPECIAL OPPORTUNITIES FUND    :
II LLC, and YA II PN, LTD.,    :
   :
                  Plaintiffs,    :   Index No.
   :
    -against-    :   **Complaint**
   :
REZOLVE AI PLC and DAN WAGNER,    :
   :
                Defendants.    :

--------------------------------------------------------------

Plaintiffs JBAAM Special Opportunities Fund – II LLC ("JBA") and YA II PN, LTD.

("YA" and, together with JBA, "Plaintiffs"), by and through their undersigned counsel, allege

for their Complaint against Rezolve AI plc[1] ("Rezolve" or "Company") and Dan Wagner

("Wagner," and, together with Rezolve, "Defendants"), upon knowledge as to their own acts

and upon information and belief as to all other matters, as follows:

### INTRODUCTION

1.     This lawsuit arises from the brazen decision by Rezolve and its founder and

Chief Executive Officer, Dan Wagner, to sabotage a $1 billion convertible note transaction (the

"Note Transaction") that Wagner decided—post-signing—was a "mistake" that should never

close.

2.     Wagner's second thoughts occurred almost immediately after the parties

executed the governing Security Purchase Agreement (the "SPA"), a Deed of Voting

Undertaking (the "Shareholder Support Agreement"), and associated transaction documents on

---

[1] Rezolve AI plc is the successor entity to Rezolve AI Limited. As Rezolve reported in its May 2, 2025, Post-Effective Amendment No. 1 to Form F-1, filed with the SEC: "[o]n March 28, 2025, Rezolve AI Limited altered its legal status under English law from a private limited company and re-registered as a public limited company. In connection with the re-registration as a public limited company in England and Wales, the Company changed its name from Rezolve AI Limited to Rezolve AI plc (the 'Company' or 'Rezolve')." This Complaint thus uses the terms "Rezolve" or the "Company" to refer to activities the company undertook under each name. In Section 9(g) of the SPA discussed herein, the parties agreed that it "shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns…."

February 21, 2025. Wagner knew, and expressly told Plaintiffs, that they were entitled to expect Defendants to perform pursuant to the terms of the contractual documents the parties had agreed. Wagner nonetheless sought to use threats of contractual non-compliance to force Plaintiffs to grant concessions that are inconsistent with the binding contracts.

3. Wagner focused on a provision in the SPA that required Rezolve to establish a customary, bankruptcy-remote special purpose vehicle ("SPV") to hold the cash and Bitcoin that would collateralize Plaintiffs' hundreds of millions of dollars of lending. Just three days after signing the SPA, Wagner told Plaintiffs that, unless they were willing to renegotiate the just-executed deal terms, he was prepared to refuse to open the required SPV bank account to prevent the financing from closing—stating that he did not care what the repercussions were. When Plaintiffs refused to be extorted, Wagner pressed forward with his threat to frustrate the closing by demanding, without any contractual basis, that Plaintiffs agree that the hundreds of millions of dollars of cash and Bitcoin that would secure Plaintiffs' lending should be held in a special purpose entity based in Kazakhstan and only in Kazakhstan.

4. Under the SPA, establishing this SPV was central to the protection and enforceability of Plaintiffs' rights. Indeed, the SPA required Rezolve to establish the SPV pursuant to documentation in form, scope, and substance acceptable to Plaintiffs. And from the time the parties executed the SPA, they worked diligently to establish the contractually-mandated SPV in Delaware, as is commercially standard. Everyone involved on both sides, including Rezolve's own lawyers, agreed that establishing the SPV in Delaware would satisfy the SPA's requirement that the form and substance of the SPV be acceptable to Plaintiffs. Neither Wagner nor anyone else raised concerns regarding this structure. Only after-the-fact did Wagner try to sabotage the closing and extort new terms by claiming that a Delaware SPV structure was somehow unacceptable and **Kazakhstan** was required as an alternative jurisdiction for the SPV.

2

5.      This conduct was a transparent ploy to derail the transaction and a brazen breach of, among other things, Rezolve's contractual obligation to "use its reasonable best efforts to timely satisfy each of" its "covenants" under the SPA, including Rezolve's contractual obligation to form a bankruptcy remote special purpose entity "pursuant to documentation in form, scope and substance acceptable to" Plaintiffs.  At the same time, Rezolve also failed to hold the shareholder meeting required to authorize the shares under the Note Transaction. Wagner personally conspired in this wrongful conduct, not just through his actions as Rezolve's CEO, but also by breaching his individual contractual obligation to exercise his voting control of Rezolve to support the Note Transaction.

6.      Defendants' calculated breaches of their obligations, and Rezolve's corresponding breach of the SPA, has caused substantial harm.  In return for committing to provide up to $1 billion of financing, Plaintiffs had the right to receive "Commitment Securities" from Rezolve worth tens of millions of dollars.  Defendants' wrongful conduct has frustrated Plaintiffs' ability to exercise these valuable bargained-for rights as well as the Conversion Rights contemplated under the SPA.  Plaintiffs thus bring this action to hold Defendants to account for the profound harm they have caused.

**THE PARTIES**

7.      Plaintiff JBAAM Special Opportunities Fund – II LLC is a Delaware limited liability company with its principal place of business at 270 West 39th Street, 11th Floor, New York, New York.

8.      Plaintiff YA II PN, LTD. is a Cayman Islands exempt limited company with its principal place of business at 1012 Springfield Avenue, Mountainside, New Jersey.

9.      Rezolve AI plc is a public limited company incorporated in England and Wales with its principal place of business located at 21 Sackville Street, London, W1S 3DN, United Kingdom.  Rezolve transacts substantial business in New York, purposefully availed itself of

3

New York law, and expressly agreed to an exclusive New York forum selection for all disputes arising from the SPA.

10.     Wagner is a natural person who is a citizen of and domiciled in England.  He is Rezolve's Chief Executive Officer, director, and controlling shareholder.  Wagner personally executed the SPA, the Deed of Voting Undertaking dated February 21, 2025 (the "Shareholder Support Agreement"), and all operative deal documents, and personally engaged in the misconduct alleged herein.

## JURISDICTION AND VENUE

11.     This Court has personal jurisdiction over all Defendants pursuant to CPLR §§ 301 and 302.  The SPA contains an express New York governing-law and exclusive-jurisdiction clause, in which Rezolve agreed that it "irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or under any of the other Transaction Documents or with any transaction contemplated hereby or thereby, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper."  In the Shareholder Support Agreement, Wagner agreed that "I irrevocably submit to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith and hereby irrevocably waive, and agree not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such sit, action or proceeding is improper."

12.     Venue is proper in New York County under CPLR § 503 because the parties contractually selected this forum, a substantial part of the events or omissions giving rise to the claim occurred in this county, and because Plaintiff's principal place of business is located in New York County.

## FACTUAL ALLEGATIONS

<u>The December 23, 2024, Letter of Intent</u>

13.     Beginning in December 2024, JBA and Rezolve, acting through Wagner, began discussions regarding a potential convertible notes facility that would position Rezolve to obtain hundreds of millions of dollars of financing. Rezolve intended to use this financing to purchase Bitcoin.

14.     On December 23, 2024, JBA and Rezolve executed a non-binding Letter of Intent ("LOI") regarding such a financing transaction. The LOI contemplated a $1 billion senior secured convertible notes facility, with JBA (or its affiliates) as lender, secured by cash and Bitcoin collateral held in a segregated, bankruptcy-remote SPV. JBA's fundings would occur in tranches: $100 million in notes on the closing date and an additional $900 million in subsequent tranches of notes, at JBA's discretion (subject to reduction to $500mm to the extent a second tranche had not been funded within six months of the registration of shares underlying the first tranche). Under the LOI, the notes would mature in five years, unless accelerated. The conversion price for each funding was to be set on the funding date at 100% of the Stock Price at any point prior to maturity, subject to a reduction to the extent that Rezolve undertook a dilutive offering in the interim. The LOI also contemplated that JBA would receive warrants in connection with providing the contemplated financing. Finally, in return for issuing the notes, JBA was entitled to receive 2.5% of each funding amount in Rezolve shares.

Case 1:25-cv-06762   Document 1-1   Filed 08/15/25   Page 8 of 25

The February 21, 2025, SPA

15.     Following execution of the LOI, Rezolve and JBA, working with deal counsel, began preparing final, binding documentation for a securities purchase agreement that would reflect the contemplated transaction.  During this period, Plaintiff YA agreed to provide financing along with JBA consistent with the terms that were being negotiated for the final deal documentation.

16.     On February 17, 2025, Wagner—in what became an unfortunate pattern—sought to retrade the agreed terms of the LOI, insisting that—notwithstanding the parties' prior understanding—it was a "no go under any circumstances" for JBA and YA to receive warrants in connection with their financings.  Such warrants, Wagner claimed, would be "toxic", despite his willingness to include such warrants in the LOI just weeks prior.

17.     In an effort at compromise, Plaintiffs agreed to drop the warrants from the financing transaction in response to Wagner's demand.

18.     On the eve of signing the transaction documents, Wagner tried to retrade again. He refused to proceed with the transaction unless JBA agreed to a base conversion price of $3 per share for the initial $100 million tranche of notes (the "Initial Note"), contrary to the pricing provisions memorialized in the documentation that the parties were set to sign, which set the conversion price based on the closing price of Rezolve stock prior to the initial closing.

19.     At this point, with Wagner's *modus operandi* becoming clear, Plaintiffs refused to put themselves in a position where Wagner would again try to back out of his commitments before signing.  JBA thus requested that Rezolve send to Plaintiffs a final version of the transaction documents that Rezolve would be willing to execute without further negotiation or retrades.  On February 21, Rezolve transmitted final deal documentation to JBA, executed by Wagner on behalf of Rezolve.  On the same date, JBA and YA counter-executed that deal documentation.

Case 1:25-cv-06762    Document 1-1    Filed 08/15/25    Page 9 of 25

20.     Immediately after signing, the parties began the logistical work of closing the transaction, including to structure a new special purpose subsidiary of Rezolve that would hold the cash and Bitcoin that would secure Plaintiffs' financing.  In the post-signing discussions, Rezolve's advisors stated that they had already formed a Delaware SPV for this purpose prior to the signing of the SPA.  The parties agreed that this Delaware entity would satisfy the SPA's requirement that the form and substance of the SPV be acceptable to Plaintiffs.  They moved forward to finalize the transaction structure on this basis with no questions or concerns that some other U.S. jurisdiction, let alone another country, should actually be the proper SPV jurisdiction instead of Delaware.

21.     Consistent with the terms in the LOI, the SPA provided for an initial $100 million financing to occur at the "Initial Closing", followed by potential additional financing tranches up to $900 million (the "Additional Notes").  JBA and YA, as the buyers of the $100 million Initial Note, had the right, at any time after the issuance date, to convert any portion of the outstanding and unpaid principal and accrued interest of their Note into validly issued, fully paid, and non-assessable ordinary shares of Rezolve.  For the initial $100 million of notes, the Conversion Price was set at $3.00 per share, subject to adjustment for certain events such as dilutive issuances, stock splits, or other corporate actions.

22.     Under the SPA, JBA and YA were also entitled to receive "Commitment Shares" as part of their financings.  For the initial $100 million issuance, the number of Commitment Shares due at the Initial Close was the product of $100,000,000 multiplied by the agreed Commitment Shares Rate of 3.5% for the Initial Closing, divided by the closing price of the relevant ordinary shares on the date the Commitment Shares were registered under the Securities Act and freely transferable.  These Commitment Shares were intended as an additional incentive and compensation to JBA and YA for their commitment to provide the financing that Rezolve desired.

7

23.     For Additional Notes issued after the initial $100 million tranche, the Conversion Price under the SPA was not fixed at $3.00 per share. Instead, the SPA provides that the Conversion Price for each Additional Note is to be determined at the time of each Additional Closing based on the 20-day Volume Weighted Average Price (VWAP) of Rezolve's ordinary shares as of the Additional Closing Date.

24.     The SPA also provides for Commitment Shares to be issued in connection with Additional Notes. The Commitment Shares Rate for the Additional Notes decreases over time as follows:

     a.     First $100 million of Additional Notes: 7.5%

     b.     Second $100 million of Additional Notes: 6.5%

     c.     Third $100 million of Additional Notes: 5%

     d.     Any Additional Notes after the third $100 million: 2.5%

25.     In addition to the Commitment Shares and the Conversion Rights, the SPA also granted JBA and YA a comprehensive set of further rights through the convertible note structure. For example:

26.     *The New SPV*. The agreement provides robust protections for Plaintiffs in the event of bankruptcy. For instance, all notes sold under the SPA are both guaranteed by Rezolve and all direct and indirect subsidiaries, including a new SPV subsidiary (the "New SPV"), and secured by a first priority perfected security interest in the assets held in a Cash Account and a Bitcoin Escrow Account maintained by the New SPV. These accounts were subject to control agreements that restrict the release of these assets. Moreover, the SPA required the New SPV to be structured as a bankruptcy-remote special purpose entity, meaning its assets would be segregated from the operating company and its other subsidiaries, reducing the risk that these assets would be consolidated into the bankruptcy estate of Rezolve or its affiliates.

Case 1:25-cv-06762    Document 1-1    Filed 08/15/25    Page 11 of 25

27.     Under this structure, the establishment of the New SPV, and ensuring its operational independence, was a critical piece of the deal structure. Accordingly, in Section 4 of the SPA, Plaintiffs required Rezolve to covenant that it would "use its reasonable efforts to timely" establish "a Subsidiary that is a bankruptcy remote special purpose entity, pursuant to documentation in form, scope and substance acceptable to" JBA and YA, which "shall maintain the Cash Account and the Bitcoin Escrow Account."

28.     Pursuant to this closing condition, on March 4, 2025, Rezolve reported to JBA that the "SPVs [were] both set up before signing. Bank account is solid progress. As agreed opening a cash account first with JPM and will send all across when done. DLA [Piper] have the SPV docs." Rezolve was referring to the formation of Rezolve AI Finance, LLC, a Delaware limited liability company that Rezolve had formed to serve as the New SPV and as to which DLA Piper—at Rezolve's and Wagner's direction—prepared an opinion letter concerning the propriety of that entity serving in that capacity in connection with each of the Transaction Documents, a draft LLC agreement, and other supporting documents.

29.     *Shareholder Support Agreement*. Section 7(x) of the SPA provides that a condition to close is that "[t]he Company shall have obtained all governmental, regulatory or third party consents and approvals set forth on Schedule 7(a)(x) hereto, if any, including without limitation the passing of the Shareholder Resolutions (which condition can only be waived with the consent of the Company. [sic]"

30.     In furtherance of this closing condition being met, Wagner personally executed the "Shareholder Support Agreement." The Shareholder Support Agreement provided:

> In order to give effect to the Transaction: (i) an ordinary resolution of the shareholders of the Company is required to give authority to the directors of the Company to allot securities in connection with the Transaction; and (ii) a special resolution of the shareholders of the Company is required to disapply pre-emption rights in relation thereto (together, the "Resolutions"). It is anticipated that the Company will request that its shareholders approve the Resolutions at a general meeting to be held following the date on which the SPA is signed by the parties thereto, but prior to the date on which the SPA closes in accordance with the terms therein (the "Meeting").

9

31.     Leaving no doubt that Wagner alone controlled sufficient shares of the Company to ensure that the Meeting timely occurred and that the Resolutions were passed (described by Defendants as a "rubber stamp"), Wagner represented in the Shareholder Support Agreement that:

> I am the beneficial owner of fully paid ordinary shares in the capital of the Company pursuant to Article 5(b) of the articles of association of the Company ("**Articles**"), the aggregate number of votes attaching to all shares in the Company to which I, as "Founder" (as that term is defined in the Articles), am beneficially entitled shall constitute at least 75% of the votes attaching to all shares in the capital of the Company. Therefore, as a result of my beneficial ownership of ordinary shares in the Company ("**Shares**"), such ownership in itself is sufficient to pass the Resolutions in accordance with the Articles.

32.     Then, in Section 2 of the Shareholder Support Agreement, Wagner committed to using his control over the Company to ensure that the Resolutions would be passed:

> I irrevocably undertake to the Buyer that I shall request and instruct the registered holder(s) to vote all of the Shares of which I am beneficial owner in favour of the Resolutions and any other resolutions required to implement the Transaction at the Meeting.

33.     *Registration Rights*.  The SPA and an accompanying Registration Rights Agreement provide robust protections to ensure that JBA's and YA's registration rights are prioritized and safeguarded in connection with their Commitment and Conversion Shares. These protections are designed to ensure that Plaintiffs can freely resell the Rezolve shares they receive in the Note Transaction and that Rezolve does not register other shares in a manner that would undermine their rights.  Such protections include a requirement that Rezolve use its reasonable best efforts to have the necessary registration statement declared effective by the SEC as soon as practicable.  The SPA also ensured against competing registrations by prohibiting Rezolve, subject to certain exclusions, from entering into any agreement providing registration rights to any other security holders until the initial registration statement covering all of Plaintiffs' rights was declared effective.

34.     *Liquidated Damages*.  Rezolve agreed that, in addition to Plaintiffs' other remedies, Plaintiffs would be entitled to liquidated damages if Rezolve refused to sell Notes as required by the SPA.  The liquidated damages were specified as the Commitment Shares associated with the unconsummated Note sale.

35.     *No Frustration of Closing*.  The SPA set the Initial Closing—i.e., the date of the initial $100 million sale of Notes to Plaintiffs—on the first business day after all conditions precedent to the Initial Closing are satisfied.  The SPA also prohibits Rezolve from frustrating or delaying the Initial Closing based on express contractual language requiring Rezolve to "use its reasonable best efforts to timely satisfy each of the covenants hereunder and conditions to be satisfied by it."

Defendants Breach the SPA and Shareholder Support Agreement

36.     After the parties executed the SPA and Shareholder Support Agreement, Defendants abandoned the transaction and attempted to avoid their obligations thereunder by intentionally frustrating the conditions to close.

37.     As early as February 24, 2025 (just three days after executing the SPA and Shareholder Support Agreement), Wagner indicated that he had no intention of complying with the terms of the SPA, regardless of the repercussions.  In a conversation with Andrew Weksler (who acted for JBA), Wagner demanded that the Conversion Price for the "Commitment Shares" owed to Plaintiffs in connection with Additional Closings be repriced at a fixed $3 per share despite the SPA's variable VWAP formula.  Wagner also delayed publicly disclosing the Note Transaction in the apparent hopes of extracting a better deal from Plaintiffs before investors learned its terms.

38.     Then, on February 25, after the Note Transaction was disclosed publicly, Wagner called Weksler and explained that: (i) he did not want to close the deal; (ii) if JBA insisted on the parties closing, Wagner said he would sit on the closing conditions and frustrate

the closing (including the required shareholder meeting); (iii) he was prepared to refuse to "open the [required New SPV] bank account for a year" to prevent a timely closing; (iv) he did not like the Commitment Share construct that he and Rezolve had agreed to; and (v) he did not like how the stock reacted to the transaction. These statements and threats directly repudiated Rezolve's contractual obligation to establish the New SPV and create the Cash Account as required by the SPA.

39.     Plaintiffs refused Wagner's demand that they revisit the terms of the transaction that had just been agreed. In return, Defendants persisted in their efforts to extort concessions. By April 2025, recognizing that Plaintiffs were properly insisting that Rezolve live up to its contractual obligations, Wagner sought to deliver on his prior threat to frustrate the Initial Closing unless he was allowed to retrade the deal, just as he had previewed when he spoke to Weksler in the days after the SPA was signed. Notably, by this period, Rezolve's stock price had decreased. This made the cost of financing under the SPA more dilutive and created a substantial incentive for Wagner to obstruct and prevent the Initial Closing, regardless of Defendants' contractual obligations.

40.     On April 28, 2025, JBA addressed Defendants' delay and obfuscation after months of foot dragging. Weksler wrote to a senior executive at Rezolve, Raymond McKeeve: "I tried you again today and have tried you multiple times over the past two weeks. I know you've been busy, but we need to see progress on the documents and we need to see a [shareholder] vote scheduled. Those are items you're required to get done reasonably promptly. If you could have the courtesy of returning my phone call, that would be helpful."

41.     Defendants failed to respond. That evening, Weksler wrote to McKeeve again: "We again didn't speak today and the excuses are piling up. RZLV is forcing our hand a bit by not moving the transaction forward as required. My hope is to answer any questions you have, but you've evaded having a conversation for weeks now. The documents contemplate

this exact scenario. My line is always open but if we don't see a vote scheduled, we'll take that as a sign that you intend to frustrate our close and not sell us the notes pursuant to the terms of the SPA."

42.    On April 29, Defendants confirmed that they did not intend to perform their obligations under the SPA and Shareholder Support Agreement. McKeeve wrote: "as discussed on Friday I have a problem with our deal as currently constructed. Dan [Wagner] is deeply concerned that our interests are too deeply misaligned." McKeeve then threatened that the parties could only get the transaction "closed asap" if Plaintiffs agreed to alter the deal terms in ways that favored Rezolve, including "[m]aking subsequent note issuances by mutual agreement rather than a put," "[e]nsuring future note underwrites are by genuine equity investors rather than trading/structuring shops like [YA]," and "[l]imiting market sales by investors once they convert." Defendants stated that they would proceed with the Initial Close if these terms were met (including with the parties using a Delaware-based New SPV). But these concessions that Rezolve sought to extract from Plaintiffs represented fundamental changes to the economic terms memorialized in the binding SPA. And Rezolve—contrary to McKeeve's threats—had an absolute obligation to use its reasonable best efforts to ensure the Initial Closing occurred on a timely basis regardless of whether Plaintiffs would agree to Rezolve's demands for new and different terms.

43.    At this stage, Rezolve was focused on trying to retrade the SPA in order to achieve a better economic deal and signaling that Wagner and McKeeve were prepared to frustrate the closing to achieve that goal. But even at this point there was no suggestion that the New SPV somehow had to be based in Kazakhstan.

44.    On May 2, Wagner, McKeeve, and Weksler participated in a video conference. During the video conference, Defendants' unwillingness to respect the contracts they had signed came to a head. Wagner straightforwardly stated that he had made a "mistake" in

Case 1:25-cv-06762   Document 1-1   Filed 08/15/25   Page 16 of 25

signing the SPA, claiming he had misunderstood the implications of the financing transaction. At the same time, Wagner conceded that this was nobody's fault but his own and that it should not be JBA's problem since Weksler was entitled to expect that Rezolve would see the financing transaction through on the terms that had been agreed. Remarkably, however, Wagner took the position that Weksler should take it upon himself to fix Rezolve's mistake as a matter of "commercial good will" since he had a "brilliant mind." For his part, Weksler made plain on May 5, 2025, that Plaintiffs, as was their contractual right, expected Rezolve to live up to the terms of the SPA the parties had signed.

45.     On May 9, in response to Defendants' continued delay and attempts to retrade, Weksler wrote to Defendants: "I hope you agree that I've been beyond patient, have done a lot to keep this from being adversarial and the teams on good terms. At the same time, we are not going to allow Rezolve to continue to ignore its contractual obligations… Your team has dragged their feet on closing the transaction in a blatant attempt to recut a better deal; a simple shareholder vote has not even been held many months post-closing… All rights reserved and none waived."

46.     On May 10, Wagner for the first time claimed it was necessary to revisit "the jurisdictional and structural setup of the SPV". He asserted that Rezolve would now—nearly three months after the SPA had been executed—be considering alternative jurisdictions instead of Delaware. Notably, by this time, Rezolve's lawyers at DLA Piper had (i) formed (even prior to execution of the SPA) two Delaware limited liability companies for the purpose of establishing the Delaware SPV structure, (ii) created and shared organizational documents such as operating agreements consistent with a customary, U.S.-law governed bankruptcy remote structure, and (iii) created and shared an organizational chart depicting the two Delaware limited liability companies within the Rezolve corporate structure. Rezolve's lawyers had also drafted and shared customary non-consolidation opinions for the Delaware SPV. At no point

in the months following the execution of the SPA did Rezolve's counsel ever suggest that the Delaware SPV structure was somehow inadequate. Even when Rezolve sent a list of new demands to JBA on April 29, it did not identify any issues with the jurisdiction of the New SPV.

47.      On May 12, Weksler sent Wagner an email challenging his sudden suggestion of the need for an alternative jurisdiction for the New SPV and noted that it could not be reconciled with the fact "[y]our team had already agreed to the DE construct, multiple times in writing and by action over the past three months." Weksler nonetheless agreed to an in-person meeting on May 13 where Wagner could try to explain his position. At the same time, he requested that Wagner provide a written explanation of the "details and rational for any changes, in advance" of the meeting, in order to ensure a productive discussion. Wagner failed to do so.

48.      At the May 13 meeting, Wagner not only claimed it was necessary to revisit the agreed Delaware SPV structure, he also raised the remarkable suggestion that the SPV should be formed in *Kazakhstan*, a country in which Rezolve has no financial or banking operations or commercial interests. When JBA asked Wagner why he thought the contractually mandated New SPV could not be based in Delaware, Wagner offered nothing more than vague and empty references to concepts like supposed "cross border and digital" concerns.

49.      On May 15, Wagner wrote to Weksler claiming that "[w]e're not looking to delay for the sake of it. But I can't put cash into a structure I haven't signed off on internally or legally. That wouldn't be responsible governance." Put differently, Wagner was claiming that he and Rezolve would not move forward with the transaction because he needed to "sign off" on it, despite Wagner having long ago personally agreed to its terms and having executed the SPA and Shareholder Support Agreement that reflect those terms months prior.

15

50.     During these conversations, notwithstanding the unreasonableness of Wagner's demands, Plaintiffs indicated that, as an accommodation, they could be flexible about establishing an SPV based in Kazakhstan to hold the **Bitcoin** Escrow Account but not the **Cash** Account.  Alternatively, Plaintiffs remained ready, willing, and able to move forward with the Note Transaction using the Delaware-based SPV structure that had already been put in place and agreed.  Plaintiffs, however, made plain that there was no justification for abandoning the parties' agreement to establish a commercially-standard Delaware SPV that would hold the Cash Account and satisfy the SPA's requirement that the form and substance of the SPV be acceptable to Plaintiffs.

51.     Ultimately, Wagner sought to justify the supposed necessity of a "Kazakhstan Based SPV and Collateral Structure" based on a so-called "Comprehensive Legal and Commercial Report" (the "White Paper").  The White Paper described purported virtues of Kazakhstan's economy and geographical position.  It did not, however, offer any concrete justification for why it would be necessary for the Cash Account required by the SPA to be held by a Kazakhstan SPV rather than a Delaware SPV.  The White Paper vaguely suggested: "While Delaware provides a long-established framework for traditional fiat custody, it lacks an integrated regime for simultaneous digital asset and fiat oversight under one regulatory body."  By contrast, the White Paper claimed that "Kazakhstan offers this dual alignment" which would "minimize[] cross-border complications and align[] with evolving best practices in crypto-financial structuring."  Nothing in the White Paper, however, even attempted to explain why any of these concepts—like an "integrated regime" or "simultaneous…oversight under one regulatory body" or supposed "cross-border complications"—had any relevance to the actual transaction that the parties had agreed upon.

52.     The short answer is they do not:  an SPV structure based in Delaware to hold cash proceeds poses no "complications" (cross-border or otherwise) while offering all the

regulatory and legal oversight required.  Indeed, Rezolve's "White Paper" itself concedes that Delaware has superior "Legal Strength" to Kazakhstan, higher "Investor Comfort" than Kazakhstan, and just as good cash "Custody Capabilities" as Kazakhstan.  And Wagner's insistence on establishing a Kazakhstan SPV to hold the Cash Account has been a transparent ploy to try to avoid the Initial Closing by insisting on a commercially unreasonable jurisdiction for the SPV structure that is fundamental to Plaintiffs' security interests. This strategy was, of course, consistent with Wagner's openly stated willingness—from almost literally the day the SPA was signed—to extort unwarranted economic concessions from Plaintiffs by delaying and obstructing the close.

53.     Defendants have never relented in their demand that the New SPV be established in Kazakhstan to hold both the Cash Account and the Bitcoin Escrow Account.

54.     Thus, nearly *five months* after Defendants executed the SPA and Shareholder Support Agreement, Defendants are still refusing (i) to move forward with a New SPV in a form "acceptable to" Plaintiffs, as mandated under the SPA, and have continued to insist on the parties' use of an unacceptable Kazakh entity for that purpose; and (ii) to undertake a Meeting to pass the Shareholder Resolutions as mandated under the SPA and the Shareholder Support Agreement.  They have thus breached both of those agreements in a transparent bid to avoid complying with contractual terms to which they agreed but now regret.

55.     In these circumstances, in a series of letters beginning on May 19, 2025, Plaintiffs provided notice to Rezolve that it was in default under, and had breached, the SPA and associated transaction documents.

56.     At the same time, Plaintiffs rejected Wagner's self-serving efforts to create a false paper trail suggesting that the Initial Closing had been delayed because Rezolve was supposedly "awaiting" Plaintiffs' "response in order to move forward."  As Plaintiffs pointed out in a June 25, 2025, email to Wagner:

17

Case 1:25-cv-06762    Document 1-1    Filed 08/15/25    Page 20 of 25

Our position on the SPV structure has been clear since the beginning of May when you for the first time came up with the notion that a Kazakhstan SPV should be considered.

What we said then was that we were generally flexible on where the crypto was held but the cash had to be held in a US SPV just as the parties had planned from the outset of the transaction as is abundantly reflected in the discussions between the parties, including in document after document created by your lawyers....When we asked you to provide a written outline of your position on these issues you refused. We then met on May 13 and your purported justifications for a Kazakhstan SPV for the cash remained as empty, and transparently pretextual, as before....

To be clear, you do not need, and are not waiting for, our comments on the Kazakhstan White Paper in order to know where we stand, since our position has been clear for over a month. You were free to create a Kazakhstan SPV for BTC if you wanted. But the cash needs to be in the same US SPV that the parties worked to set up from the start....

The Harm to Plaintiffs

57. But for Defendants' refusal to live up to their contractual obligations, Plaintiffs were ready, willing, and able to proceed with the $100 million note transaction contemplated at the Initial Close and the $900 million Additional Note transactions that were to follow, at their discretion, thereafter.

58. Plaintiffs, for example, have repeatedly stated that, as an accommodation, they are prepared to consent to a structure for the New SPV pursuant to which a Delaware domiciled bankruptcy-remote SPV would hold the Cash Account (the primary collateral in the Note Transaction) and a Kazakhstan domiciled bankruptcy-remote SPV would hold the Bitcoin Escrow Account. Plaintiffs also have the funds available to fund the $100 million Note purchase at the Initial Close and to fund further Additional Note purchases up to the $900 million limit in the SPA.

59. Rezolve's breach of the SPA and Wagner's breach of the Shareholder Support Agreement have caused Plaintiffs hundreds of millions of dollars of harm. Had Defendants not wrongfully prevented the Initial Close, Plaintiffs would have received Commitment Securities worth ten million dollars. Moreover, as of June 25, 2025, had Defendants not wrongfully prevented the Initial Close, Plaintiffs would have had the right to purchase up to $900 million in Additional Notes at the trailing 20-day VWAP. Given Rezolve's share price,

18

Plaintiffs' inability to exercise this right has resulted in hundreds of millions of dollars of lost value, all of which is further attributable to Defendants' breach of their contractual obligations.

60.    At a minimum, under Section 8(b) of the SPA, for all the reasons discussed, Rezolve has refused to sell Notes as the SPA requires, thereby entitling Plaintiffs, at a minimum, to "receive the Commitment Securities excluding the Note and Additional Notes, as liquidated damages, without paying any Purchase Price … subject" only "to the payment of the Nominal Value of the Commitment Securities." Those Commitment Securities, in aggregate, are worth over $40 million dollars.

## CLAIMS FOR RELIEF
### Count I – Breach of Section 4(aa) of the SPA
### (against Rezolve)

61.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

62.    The SPA is an enforceable contract between JBA, YA, and Rezolve.

63.    Plaintiffs have performed all of the material conditions, covenants, and promises required to be performed under the SPA, and were ready, willing, and able to perform any continuing or future obligations thereunder.

64.    Section 4(aa) of the SPA states that: "Prior to the Closing, the Company shall form a Subsidiary that is a bankruptcy remote special purpose entity, pursuant to documentation in form, scope and substance acceptable to the Required Holders and the Collateral Agent. Such special purpose entity ("**New SPV Subsidiary**") shall maintain the Cash Account and the Bitcoin Escrow Account."

65.    The Company has breached Section 4(aa) of the SPA by failing to form a Subsidiary meeting the requirements thereunder.

66.    As a direct and proximate result of the Company's breach of Section 4(aa) of the SPA, Plaintiffs have suffered damages in an amount to be proven at trial.

19

Case 1:25-cv-06762    Document 1-1    Filed 08/15/25    Page 22 of 25

## Count II – Breach of Section 4(a) of the SPA
### (against Rezolve)

67.  Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

68.  The SPA is an enforceable contract between JBA, YA, and Rezolve.

69.  Plaintiffs have performed all of the material conditions, covenants, and promises required to be performed under the SPA, and were ready, willing, and able to perform any continuing or future obligations thereunder.

70.  Section 4(a) of the SPA mandates that: "The Company shall use its reasonable best efforts to timely satisfy each of the covenants hereunder and conditions to be satisfied by it as provided in Section 7 of this Agreement as long as the Notes are outstanding."

71.  The Company has breached Section 4(a) of the SPA by failing to make reasonable best efforts to timely satisfy its obligations under Sections 4(aa) and 7(a)(x) of the SPA and, instead, intentionally delaying and frustrating compliance with those provisions.

72.  As a direct and proximate result of the Company's breach of Section 4(a) of the SPA, Plaintiffs have suffered damages in an amount to be proven at trial.

## Count III – Breach of the Implied Covenant in the SPA
### (against Rezolve and in the alternative)

73.  Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

74.  The SPA is an enforceable contract between JBA, YA, and Rezolve.

75.  Plaintiffs have performed all of the material conditions, covenants, and promises required to be performed under the SPA, and were ready, willing, and able to perform any continuing or future obligations thereunder.

76.  Implicit in all contracts governed by New York law is a covenant of good faith and fair dealing.  The covenant of good faith and fair dealing provides that a party shall not do

anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

77.     To the extent Rezolve had any discretion to determine the domicile of the New SPV, Rezolve exercised that discretion in bad faith by insisting that the domicile of the New SPV be Kazakhstan (rather than Delaware as the parties had already documented), with the purpose of frustrating the closing conditions under the SPA and thereby destroying or injuring Plaintiffs' rights to receive the fruits of their bargain in violation of the implied covenant of good faith and fair dealing.

78.     As a direct and proximate result of Rezolve's breach of the implied covenant of good faith and fair dealing, Plaintiffs have suffered damages in an amount to be proven at trial.

### Count IV – Breach of the Shareholder Support Agreement
### (against Wagner)

79.     Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

80.     The Shareholder Support Agreement is an enforceable contract between JBA, YA, and Wagner.

81.     In Section 2 of the Shareholder Support Agreement, Wagner agreed as follows: "I irrevocably undertake to the Buyer that I shall request and instruct the registered holder(s) to vote all of the Shares of which I am beneficial owner in favour of the Resolutions and any other resolutions required to implement the Transaction at the Meeting."

82.     Wagner breached Section 2 of the Shareholder Support Agreement by failing to request and instruct the registered holder(s) to vote all of the Shares of which Wagner is the beneficial owner in favour of the Resolutions and any other resolutions required to implement the Transaction at a Meeting.

83.     As a direct and proximate result of Wagner's breach of the Shareholder Support Agreement, Plaintiffs have suffered damages in an amount to be proven at trial.

### Count V – Breach of the Implied Covenant in the Shareholder Support Agreement
### (against Wagner and in the alternative)

84. Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

85. The Shareholder Support Agreement is an enforceable contract between JBA, YA, and Wagner.

86. Implicit in all contracts governed by New York law is a covenant of good faith and fair dealing. The covenant of good faith and fair dealing provides that a party shall not do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

87. To the extent Wagner had any discretion over the timing of any Meeting at which the shareholders would vote in respect of the Resolutions or any other resolutions required to implement the Transaction at the Meeting, Wagner exercised that discretion in bad faith by failing to conduct a Meeting with the purpose of frustrating the closing conditions under the SPA and thereby destroying or injuring Plaintiffs' rights to receive the fruits of their bargain in violation of the implied covenant of good faith and fair dealing.

88. As a direct and proximate result of Wagner's breach of the Shareholder Support Agreement, Plaintiffs suffered damages in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully demand judgment:

a. Awarding compensatory, consequential, and liquidated damages in an amount to be determined at trial;

b. Declaring that Rezolve breached the SPA and that Plaintiffs are entitled to receive all Commitment Securities without further payment;

c. Granting pre- and post-judgment interest; and

d. Granting such other and further relief as the Court deems just and proper.

22

Dated: July 18, 2025

Respectfully submitted,

/s/ *Eric Brenner*
Eric Brenner
Marc Ayala
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
(212) 446-2300
ebrenner@bsfllp.com
mayala@bsfllp.com